IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANNA QUINATA, | ) CIVIL NO. 13-00339 JMS-KSC |
| | ) |
| Plaintiff, | ) ORDER DENYING PLAINTIFF'S |
| | ) EX PARTE MOTION FOR |
| vs. | ) TEMPORARY RESTRAINING |
| | ) ORDER |
| RHONDA NISHIMURA, in her | ) |
| individual capacity, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**ORDER DENYING PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER**

**I. INTRODUCTION**

On July 11, 2013, pro se Plaintiff Anna Quinata ("Quinata") filed a Complaint against Hawaii State Circuit Court Judge Rhonda Nishimura ("Judge Nishimura"), BMW Bank of North America ("BMW Bank"), the Honolulu law firm Cades Shutte LLP, and Cades Shutte LLP employees Theodore D.C. Young, Alana Peacott-Richards, Megan A. Suehiro, and Anthony Shannon (collectively, "Defendants"). Quinata alleges that BMW Bank, with the assistance of Cades Shutte LLP and its employees, wrongfully filed an action in Hawaii state court asserting that Quinata used a false check to pay the balance on a BMW X5 sport utility vehicle (the "X5") she purchased through financing. Quinata alleges that in

the state court action, Judge Nishimura issued an ex parte order granting BMW Bank possession of the X5, and that Defendants' attempts to deprive her of the X5 violate her due process rights.

Currently before the court is Quinata's Motion for Temporary Restraining Order ("Motion for TRO"). Quinata requests that the court enter an order restraining Defendants "from compelling Plaintiff to submit to ex parte Orders granting immediate possession of the Vehicle." Doc. No. 24, at Proposed Order. A status conference was held on August 2, 2013. Defendants submitted Oppositions on August 15, 2013, Doc. Nos. 36-38, and Quinata submitted a Reply on August 23, 2013. Doc. No. 41. A hearing was held on August 23, 2013. Based on the parties' briefing, the arguments made, and the entire record before the court, the court DENIES the Motion for TRO.

## II. FACTUAL BACKGROUND

A. **The Contract for the X5**

On November 20, 2011, Quinata entered into a contract with BMW of Honolulu to purchase the X5 for $85,412.55 (the "Contract"). Doc. No. 1-1, Compl. Ex. A at ECF 7 of 19. Quinata made no cash down payment, and instead traded in a vehicle, obtained a manufacturer's rebate, and borrowed the remaining balance ($66,996.58) from BMW of Honolulu. *Id.*

Pursuant to Section 11 of the Contract, it was assigned to BMW Bank. *Id.* Section 13(c) of the Contract gives BMW Bank a security interest in the X5, which "secures payment and performance of [Quinata's] obligations under the Contract, or any extensions thereof, including any indebtedness subsequently arising because of [Quinata's] failure to perform such obligations." *Id.* at ECF 8 of 19. In the event of default, section 16(b) of the Contract gives BMW Bank the right to accelerate payments and to repossess the X5. *Id.*

**B.     The State Action**

In January 2012, Quinata provided BMW Bank a check in the amount of $66,577.72, appearing to be drawn from a First Hawaiian Bank account, to pay off the balance due on the X5. *Id.* at ECF 9 of 19. On February 1, 2012, First Hawaiian Bank returned the check with the notation "UNABLE TO LOCATE ACCT."[1] *Id.*

On May 22, 2012, BMW Bank, through its attorneys at Cades Shutte, filed a verified complaint in the First Circuit Court of the State of Hawaii alleging claims against Quinata for breach of contract, conversion, and fraud (the "State

---

[1] Although not asserted in the Complaint, Quinata asserts that this check discharged her debt on the X5 and that BMW Bank notified her that she had satisfied her debt. *See* Doc. No. 41, Quinata Reply at 10.

Action"). Doc. No. 29-2, BMW Bank Ex. 1, State Action Complaint.[2] BMW Bank further sought an entry of order and judgment for immediate possession of the X5 by filing an ex parte Motion for Immediate Possession of Personal Property pursuant to Hawaii Revised Statutes ("HRS") § 654-2 (the "Ex Parte Motion"). Doc. No. 1-1, Compl. Ex. A at ECF 2 of 19. The Ex Parte Motion requested an order "directed to the sheriff or his deputy, or to the Chief of Police or an authorized police officer of the City and County of Honolulu, State of Hawaii, or a person authorized by the rules of court, to take the property described in the foregoing Verified Complaint." *Id*. at ECF 2-3 of 19. The Ex Parte Motion included a $75,000 Bond for Immediate Possession, and an Affidavit for Immediate Possession of Personal Property by BMW collections agent Bill McFarlane. *Id.* at ECF 4-6 and 11-12 of 19.

The Affidavit outlines that (1) on November 20, 2011, Quinata entered into the Contract with BMW of Honolulu to purchase the X5; (2) Quinata took possession of the X5; (3) BMW of Honolulu assigned the Contract to BMW Bank; (4) Quinata provided BMW Bank a January 23, 2012 check drawn on a First Hawaiian Bank account in the amount of $66,577.72; (5) on February 1, 2012,

---

[2] The court takes judicial notice of the documents filed in the State Action, which were provided with Motions to Dismiss filed by various Defendants. *See Reyn's Pasta Bella v. Visa USA*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (explaining that the court "may take judicial notice of filings and other matters of public record").

BMW Bank was notified that the check was returned because the account on the check could not be located; (6) Quinata has not made a payment on the X5 since January 2, 2012; (7) despite repeated demands, Quinata has made no further payments and has refused to voluntarily surrender the X5; (8) BMW Bank believes that the X5 is in Quinata's possession at her residence; (9) BMW Bank has a valid security interest in the X5 as set forth in the Contract; and (10) Quinata is in default on the loan in the amount of $67,869.51, including interest.  *Id.* at ECF 4-6 of 19.

On May 23, 2012, Judge Nishimura granted the Ex Parte Motion and issued an Order for Immediate Possession of Personal Property (the "Ex Parte Order").  The Ex Parte Order states that "this Court has inquired into the matter and finds that a prima facie claim for relief has been established; that the form, amount, and surety of the bond are good and sufficient and should be and are hereby approved by this Court; and that an order for immediate possession should issue subject to the protective provisions of [HRS § 654]."  *Id.* at ECF 18 of 19. The Ex Parte Order directs the "sheriff of the state of Hawaii, or his deputy, or the chief of police or any authorized police officer of the city and county of Honolulu, or a person authorized by the rules of court," to take possession of the X5 and deliver it to BMW Bank, unless before delivery Quinata makes an affidavit of her interest and right to possession of the X5 and executes a court-approved bond as

5

required by HRS § 654-5.  *Id.* at ECF 18-19 of 19.

After BMW Bank was unable to locate the X5, it sought to compel Quinata to disclose its location.  Quinata participated in the State Action, *see, e.g.*, Doc. No. 25-2, Ex. 2 (Motion to Dismiss); Doc. No. 25-3, Ex. 3 (Answer), and fought BMW Bank's efforts at learning this information.  Specifically, in response to Judge Nishimura's orders requiring Quinata to testify under oath regarding the location of the X5, Quinata did not appear and instead filed various objections and requests for continuances, citing medical complications stemming from her pregnancy.  *See* Doc. No. 29-5, Ex. 4.  Judge Nishimura granted the request for continuance, ordered the hearing for Quinata's testimony to take place several months later (July 12, 2013), and gave Quinata the option to appear at a deposition at the Cades Shutte offices, testify telephonically, or to provide written answers to written questions by BMW Bank regarding the location of the X5.  Doc. No. 29-7, Ex. 5.  Quinata did not appear at the July 12, 2013 hearing.  Instead, on on July 11, 2013, Quinata filed this action asserting that Defendant's actions violated her due process rights.

Since the filing of this action and Quinata's failure to appear at the July 12, 2013 hearing, Judge Nishimura stated that a bench warrant would issue for Quinata's arrest.  Doc. No. 29-8, Ex. 7.  Quinata's attempts to quash and/or recall

the bench warrant have been rejected by the circuit court. Doc. No. 29-10, Ex. 9.

### III. STANDARD OF REVIEW

A TRO may issue only if the plaintiff meets her burden under well-established factors. The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *See, e.g.*, *Hawaii v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1247 (D. Haw. 1999); *cf. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (observing that an analysis of a preliminary injunction is "substantially identical" to an analysis of a temporary restraining order).

A "preliminary injunction is an extraordinary and drastic remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20; *accord Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009). "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

injunction is in the public interest." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). *Winter* emphasizes that a plaintiff seeking preliminary relief must demonstrate that "irreparable injury is *likely* in the absence of an injunction." 555 U.S. at 22; *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

## IV. DISCUSSION

Quinata's Complaint asserts a single claim pursuant to 42 U.S.C. § 1983 that Defendants violated her rights to due process when Judge Nishimura issued the Ex Parte Order for possession of the X5 without providing Quinata notice and an opportunity for a meaningful hearing. Doc. No. 1, Compl. ¶¶ 22-24. Based on the following, the court finds that Quinata has failed to establish a likelihood of success on the merits on this claim as to any Defendant, and as a result, her Motion for TRO fails.

**A.     Judge Nishimura**

Quinata has no likelihood of success in establishing a claim against Judge Nishimura. Judges are absolutely immune from liability for acts done by them in the exercise of their judicial functions. *See, e.g.*, *Miller v. Davis*, 521 F.3d 1142, 1145 (9th Cir. 2008); *Mullis v. Bankr. Ct. for the Dist. of Nev.*, 828 F.2d 1385, 1388 (9th Cir. 1987) (holding that judges are absolutely immune from civil

liability for damages for their judicial acts). The doctrine of absolute judicial immunity is based on the policy that "judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554 (1967) (applying judicial immunity to an action under 42 U.S.C. § 1983 action). Judicial immunity is an immunity from suit, not just from ultimate assessment of damages. *See Mireles v. Waco*, 502 U.S. 9, 11 (1991). "Accordingly, judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial." *Id.* Judicial immunity applies "however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." *Moore v. Brewster*, 96 F.3d 1240, 1243-44 (9th Cir. 1996), *superceded by statute on other grounds as recognized in Tia v. Mollway*, 2011 WL 2945813, at *4 (D. Haw. July 20, 2011). "A judge is not deprived of immunity because he takes actions which are in error, are done maliciously, or are in excess of his authority." *Meek v. Cnty. of Riverside*, 183 F.3d 962, 966 (9th Cir. 1999) (citing *Stump v. Sparkman*, 435 U.S. 349, 355-56 (1978)).

Quinata asserts that Judge Nishimura improperly (1) entered the Ex Parte Order, (2) failed to be persuaded by Quinata's arguments that Defendants had committed various crimes, (3) continued to preside over the case after Plaintiff

sought her disqualification, and (4) issued a bench warrant for Quinata after she failed to appear at hearings. *See* Doc. No. 1, Compl. ¶¶13-14, 17-20. Because these allegations are all directed to Judge Nishimura's acts done in the exercise of her judicial functions, Judge Nishimura is absolutely immune from suit. Plaintiff's claim against Judge Nishimura therefore fails.

**B.     Individual Defendants**

Quinata has also failed to show a likelihood of success on her due process claim against the other Defendants.[3]

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "This inquiry [] examine[s] the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). To determine whether HRS § 654-2 satisfies due

---

[3] Although the remaining Defendants are private individuals, the facts of this case may be sufficient to establish that Defendants are acting under color of law. *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 931 (1982) (stating that "a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment."). Because the court finds that Quinata will likely fail to establish a due process violation, the court need not determine whether the remaining Defendants qualify as state actors.

process, the court must apply the three-part inquiry of *Mathews v. Eldridge*, 424 U.S. 319 (1976):

> First, the court must consider the private interest that will be affected by the prejudgment action. Second, the court examines the risk of erroneous deprivation and the probable value of additional safeguards. Third, in the case of a dispute between private parties rather than between an individual and the government, the court must consider the interest of the party seeking the prejudgment remedy, with "due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections."

*Tri-State Dev., Ltd. v. Johnston*, 160 F.3d 528, 530 (9th Cir. 1998) (quoting *Connecticut v. Doehr*, 501 U.S. 1, 11 (1991)).

The Supreme Court has examined the procedural safeguards found in a number of creditor remedies statutes, and defined the contours of their constitutionality. *See, e.g.*, *Connecticut v. Doehr*, 501 U.S. 1 (1991) (holding invalid Connecticut statute that "authorizes prejudgment attachment of real estate without prior notice or hearing, without a showing of extraordinary circumstances, and without a requirement that the person seeking the attachment post a bond"); *N. Ga. Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975) (striking down Georgia statute which permitted garnishment of a business's bank account with the posting of a bond but without notice, and where the statute did not provide for judicial

supervision, a factually complete affidavit, or an early hearing); *Fuentes v. Shevin*, 407 U.S. 67 (1972) (holding that Florida law that authorized repossession of sold goods without judicial order, approval, or participation was unconstitutional); *Sniadach v. Family Fin. Corp.*, 395 U.S. 337 (1969) (striking down state statute allowing prejudgment garnishment of wages without notice and prior hearing).

This case is factually similar to *Mitchell v. W. T. Grant Co.*, 416 U.S. 600 (1974), which upheld a Louisiana statute allowing the prejudgment seizure of goods subject to a security interest. Although the Louisiana statute required no notice and opportunity to be heard prior to seizure, it contained other procedural safeguards, including that (1) the vendor submit both a verified petition outlining "specific facts" showing a basis for his claim; (2) the vendor submit a bond to protect against any damages in the event of improper seizure; (3) a writ for seizure may not issue until a judge (as opposed to a court clerk) determines that the vendor has made the appropriate showing; and (4) after seizure, the debtor may immediately seek dissolution of the writ and/or possession by posting his own bond. *Id*. at 605-06. *Mitchell* explained that these procedures satisfied due process -- the state has a legitimate interest in enabling the creditor to enforce his security interest in the debtor's property, and the absence of notice and a hearing prior to a seizure serves the creditor's interest by preventing the debtor from concealing,

transferring, or wasting the property. *Id.* at 608-09. At the same time, the harm that a wrongful seizure might cause was minimized by the provision for notice and hearing immediately after the seizure, as well as the pre-seizure requirements. *Id.* at 610. *Mitchell* concluded that with these procedures, "the State has reached a constitutional accommodation of the respective interests" of the creditor and the debtor.[4] *Id.*

HRS Ch. 654 has similar safeguards as in *Mitchell*. A claimant seeks possession of property at issue by (1) filing a verified complaint showing entitlement to immediate possession of the property at issue, *see* HRS § 654-1; and (2) executing a bond "of such amount and with such sureties as are approved by the court." HRS § 654-2. A court determines whether seizure should occur. Specifically, HRS § 654-2 provides:

> Upon the filing of the verified complaint or affidavit with the bond and a motion for immediate consideration of the matter, the court shall forthwith inquire into the matter, ex parte or otherwise, as in its discretion it determines. If thereupon the court finds that a prima facie claim for

---

[4] Although *Mitchell* was decided before *Mathews*, *Mitchell's* rationale considered the same factors outlined in *Mathews*, and courts have applied *Mitchell* to hold that similar replevin and/or attachment statutes do not violate due process. *See, e.g.*, *Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 731 (8th Cir. 2001) *opinion reinstated sub nom. Audio Odyssey v. Brenton First Nat'l Bank*, 286 F.3d 498 (8th Cir. 2002); *McLaughlin v. Weathers*, 170 F.3d 577, 581 (6th Cir. 1999), *Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*, 795 F.2d 1344, 1350 (7th Cir. 1986). The court therefore relies on both *Mathews* and *Mitchell* in addressing Plaintiff's claim.

> relief has been established, it shall issue an order directed to the sheriff, sheriff's deputy, chief of police, an authorized police officer of any county, or an independent civil process server from the department of public safety's list under section 353C- to take the property therein described and deliver the same to the plaintiff.

The defendant also has options -- upon application, the proceeding "shall be advanced and assigned for hearing at the earliest possible date," *id.*, and if seizure has occurred, the defendant may make an affidavit and execute a bond to have the property returned pending resolution of the proceeding. HRS § 654-5.

      The court finds Plaintiff has no likelihood of success in establishing that HRS Ch. 654 fails to meet due process requirements. Although an ex parte order of immediate possession will certainly significantly affect a defendant's property rights, HRS Ch. 654 minimizes the risk of erroneous deprivation -- the claimant must set forth specific facts showing entitlement to the property and execute a bond, and the issuance of an order requires court involvement. Especially in the case of a debtor/creditor, proof of the debt, the lien, and the delinquency "are ordinarily uncomplicated matters that lend themselves to documentary proof" such that "[t]he nature of the issues at stake minimizes the risk that the writ will be wrongfully issued by a judge." *Mitchell*, 416 U.S. at 609-10. Further, that the debtor may advance the proceeding for hearing at the earliest

possible date lessens the interruption with her possessory rights to her property. *See id.* at 610 ("[T]he debtor may immediately have a full hearing on the matter of possession following the execution of the writ, thus cutting to a bare minimum the time of creditor- or court-supervised possession."). And although a pre-deprivation hearing may provide an additional safeguard against erroneous repossession, the risk of erroneous deprivation is already small and the bond would compensate for any improper seizure.

Indeed, weighing against such additional safeguard is that creditors have substantial interests in securing property that is the subject of a loan, and as *Mitchell* explains, there is a risk "that the buyer, with possession and power over the goods, will conceal or transfer the merchandise to the damage of the seller." *Id.* at 608-09. *Mitchell* further reasons that where an installment payment plan is involved such as here, a delay in retrieving the property may erode a creditor's ability to be made whole:

> Wholly aside from whether the buyer, with possession and power over the property, will destroy or make away with the goods, the buyer in possession of consumer goods will undeniably put the property to its intende[ed] use, and the resale value of the merchandise will steadily decline as it is used over a period of time. Any installment seller anticipates as much, but he is normally protected because the buyer's installment payments keep pace with the deterioration in value of the security. Clearly, if payments cease and possession and use by the

15

> buyer continue, the seller's interest in the property as
> security is steadily and irretrievably eroded until the time
> at which the full hearing is held.

*Id.* at 608. Weighing these considerations, the court finds that a facial challenge to HRS Ch. 654 likely fails.

The court further finds that Quinata has not established a likelihood of success on an as-applied challenge. Rather, it appears that Defendants followed HRS Ch. 654 to the letter -- Defendants filed a verified complaint outlining the basis for BMW Bank's right to the X5 as required by HRS § 654-1, and also provided a bond as required by HRS § 654-2. Judge Nishimura then considered this information in issuing the Ex Parte Order. Although Quinata did not have the opportunity for notice and a hearing before the Ex Parte Order was issued, Quinata has had multiple opportunities to participate in the State Action, and still has possession of the X5.[5] Under these facts, Quinata has not shown a likelihood of success on an as-applied challenge.

In opposition, Quinata argues that pursuant to *Mitchell*, a seizure without notice and hearing is permissible only where there are extraordinary circumstances, and there are no extraordinary circumstances in this action. *See*

---

[5] At this time, the court need not determine whether the mere issuance of the Ex Parte Order, without repossession of the X5, deprived Quinata of any property interests. Further, because Quinata has not established a likelihood of success, the court need not address Defendants' other arguments for denying the Motion for TRO.

Doc. No. 41, Quinata Reply at 6. The court rejects this argument. *Mitchell* included no specific requirement that "extraordinary circumstances" exist to allow seizure of personal property without a hearing. Rather, two years before *Mitchell*, *Fuentes* stated that a pre-deprivation hearing is generally required "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." 407 U.S. at 83 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378-379 (1971)). As a result of *Mitchell's* silence regarding "extraordinary situations," some courts have rationalized that *Mitchell* "perhaps narrowed" *Fuentes*' "extraordinary situations" language. *See Audio Odyssey, Ltd.*, 245 F.3d at 730. Other courts have rationalized that *Mitchell* implicitly determined that the Louisiana statute at issue presented an extraordinary situation in light of the procedural safeguards and the interests of the creditor in preserving the personal property. *See Doehr*, 501 U.S. at 6 (discussing Second Circuit's reasoning); *id.* at 16 (stating that *Mitchell* recognized that an assertion that the defendant was about to transfer property and/or that the property may not be available to satisfy judgment are "exigent circumstances" permitting the postponement of a hearing). Regardless of how *Mitchell* and *Fuentes* are squared with one another, they confirm that *Mitchell* is still good law -- *Mitchell* determined that the Louisiana statute was facially valid, and the statute did not

require the plaintiff to establish extraordinary or exigent circumstances to obtain a writ of sequestration for personal property without a hearing. *See Mitchell*, 416 U.S. at 605. *Mitchell's* facts and rationale are directly applicable to this action.

Quinata also argues that HRS Ch. 654 is "virtually indistinguishable" from the statutes at issue in *Doehr* and *Tri-State*. Doc. No. 41, Quinata Reply at 7-8. The court rejects this argument as well. Both *Doehr* and *Tri-State* involved challenges to statutes allowing attachment of real property without notice and a hearing, as opposed to the personal property replevin statutes at issue in *Mitchell* and this action. *See Doehr*, 501 U.S. at 5; *Tri-State*, 160 F.3d at 529. *Tri-State* explained that the Washington statute at issue was more similar to the Connecticut statute at issue in *Doehr* because they both (1) "allow[] prejudgment attachment without prior notice or a hearing, requiring only a finding of "probable cause to believe the allegations of plaintiff's affidavit," and (2) "do[]not require a showing of extraordinary circumstances, such as an allegation that the defendant is about to transfer or encumber the property, or otherwise make it unavailable to satisfy a judgment." *Tri-State*, 160 F.3d at 530. *Tri-State* explained that these statutes differ from that in *Mitchell*, where "'the plaintiff had a vendor's lien to protect, the risk of error was minimal because the likelihood of recovery involved uncomplicated matters that lent themselves to documentary proof, and the plaintiff

was required to put up a bond,' factors all missing in *Doehr*," and all missing in *Tri-State* except for the bond requirement. *Id.* at 531.

> *Tri-State* further distinguished *Mitchell* because:
>
> In *Mitchell*, the party seeking sequestration had a vendor's lien on household goods sold on an installment contract to Mitchell, and there was no question of the vendor's interest in the property. Thus, unlike the instant case, the vendor clearly had an interest in the property, Mitchell's interest in the property was limited to any surplus remaining after foreclosure and sale of the property in the event of his default, and there was the risk that the buyer could conceal, transfer, or damage the goods. *See Mitchell*, 416 U.S. at 604, 607-09.

*Id.* These facts in *Mitchell* are the same as in this case -- there is no question of BMW Bank's interest in the X5, Quinata's interest in the X5 is limited to any surplus remaining after foreclosure and sale of the X5, and there is certainly a risk (realized and exemplified in this case) that Quinata could conceal, transfer, or damage the X5. As a result, *Doehr* and *Tri-State* do not support that Quinata has a due process claim.

In sum, because Quinata has not demonstrated that she is likely to succeed on the merits of her claim, she necessarily cannot obtain a TRO -- *Winter* requires all four elements (likelihood of success, likelihood of irreparable harm, a favorable balance of equities, and demonstrating that an *injunction* is in the public interest). *Winter*, 555 U.S. at 20.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Ex Parte Motion for Temporary Restraining Order is DENIED.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 26, 2013.



   /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Quinata v. Nishimura et al.*, Civ. No. 13-00339 JMS-RLP, Order Denying Plaintiff's Ex Parte Motion for Temporary Restraining Order